1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5    MARVIN C. HARRIS,                    )      No. C 04-1478 SBA (PR)
                                          )
6              Petitioner,                )      **ORDER DENYING PETITION**
          v.                              )      **FOR WRIT OF HABEAS**
7                                         )      **CORPUS**
     MENDOZA POWERS, Acting Warden,       )
8                                         )      (Docket nos. 60, 63)
               Respondent.                )
9    _____ )

10                          **INTRODUCTION**

11          Petitioner Marvin C. Harris, a prisoner at the Avenal State Prison, filed this <u>pro se</u> action

12   seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now submitted for the Court's

13   consideration of the merits of the petition.  For the reasons discussed below, the petition is DENIED.

14                     **PROCEDURAL BACKGROUND**

15

16          In 1984, Petitioner was convicted of second-degree murder and of using a knife in the

17   commission of the murder.  (Resp't Ex. 1.)  He was sentenced to fifteen years to life in prison,

18   including a one-year dangerous weapon enhancement.  (<u>Id.</u>)  The present petition does not challenge

19   Petitioner's underlying conviction.  Rather, it challenges the denial of parole suitability by the Board

20   of Prison Terms (hereinafter "BPT") held in 2002.[1]

21          On December 4, 2002, the BPT denied Petitioner parole.  (Resp't Ex. 3.)  The BPT identified

22   several factors in support of its determination that Petitioner was not suitable for parole.  The factors

23   identified included the circumstances of the murder, Petitioner's prior criminal and unstable social

24   history, his inadequate performance in prison (i.e., nine counseling memoranda and four serious rule

25   violation reports since his last physical appearance before the BPT), his marginal vocational

26

27   _____

28          [1]  The BPT was abolished on July 1, 2005 and replaced with the Board of Parole Hearings.
     <u>See</u> CAL. GOV. CODE § 12838.4.  The Court will continue to use "BPT" to denote the past actions of
     the Board of Parole Hearings, the real party in interest.

upgrade, his need for additional self-help and/or therapy programs, and the Oakland Police Department's opposition to parole.  (Id.)

Petitioner sought habeas relief in state court.  In April, 2004, the Alameda County Superior Court summarily denied his state habeas petition for failure to state a prima facie case.  (Resp't Ex. 8.)  There is no record that Petitioner filed a petition for writ of habeas corpus in the state appellate court.  (Resp't Ex. 9.)  On March 23, 2005, the California Supreme Court summarily denied his state habeas petition.  (Resp't Ex. 11.)

On April 15, 2004, Petitioner filed his federal petition challenging the 2002 decision by the BPT finding him unsuitable for parole (docket no. 1).  He claims that he should have been found suitable for parole under the statutory or regulatory standards.  He alleges that the decision to find him unsuitable for parole violated his due process rights, because there was no evidence to support the finding.  He also alleges that the denial of parole unlawfully increased his sentence to life without the possibility of parole, in violation of the ex post facto prohibition.

The Court subsequently dismissed the petition with leave to amend on May 10, 2004 (docket no. 6).  The Court determined that it appeared from the petition that the claims were unexhausted because Petitioner did not allege that he pursued his habeas claims to the California Supreme Court. (May 10, 2004 Order at 2.)  Petitioner was given leave to amend his petition, "in case he inadvertently omitted habeas petitions that he filed in the higher state courts."  (Id.)

On June 4, 2004, Petitioner filed his first amended petition stating that the claims presented therein were unexhausted and pending in a state habeas petition before the California Supreme Court (docket no. 7).

On April 4, 2005, the Court received Petitioner's second amended petition (hereinafter "SAP").  Petitioner stated that his state habeas petition had been denied by the California Supreme Court on March 23, 2005.

The Court served Petitioner's first amended petition on July 25, 2005, without reviewing his SAP (docket no. 17).  The Court directed Respondent to file an answer and/or dispositive motion.

On September 26, 2005, Respondent moved to dismiss the petition for failure to:  (1) exhaust

state court remedies; (2) present a federal question for review; and (3) state a valid ex post facto claim.  Petitioner opposed the motion, and Respondent filed a reply to the opposition.

On September 6, 2006, the Court denied in part and granted in part Respondent's motion to dismiss.  (Sept. 6, 2006 Order at 7.)  The Court denied the motion to dismiss as to Respondent's claim of Petitioner's failure to exhaust his available state court remedies.  (Id. at 2-3.)  The Court granted Petitioner leave to file his SAP with his newly-exhausted due process claim,[2] and found that he exhausted his state court remedies because his SAP related back to his first amended petition. (Id. at 4-5.)  The Court denied the motion to dismiss as to Petitioner's claim of a due process violation relating to the BPT's 2002 parole denial upon finding that he had a liberty interest in parole.  (Id. at  5-6.)  Finally, the Court granted Respondent's motion to dismiss as to Petitioner's ex post facto claim upon finding that the claim was legally meritless.  (Id. at 6-7.)  A second order to show cause was issued, and the SAP was served on Respondent.  (Id. at 7.)  The Court directed Respondent to file an Answer showing cause why a writ of habeas corpus should not be issued as to Petitioner's due process claim.  (Id.)

On November 6, 2006, Respondent filed a motion to dismiss the SAP on the ground that it alleges insufficient facts to support Petitioner's due process claim (docket no. 45).  Petitioner opposed the motion.

On June 5, 2007, the Court denied Respondent's motion to dismiss the SAP upon finding that Petitioner's due process claim did not require additional facts for Respondent to file an Answer. (June 5, 2007 Order at 3.)  Respondent was again ordered to show cause why a writ should not be issued on Petitioner's due process claim.  (Id.)

On August 6, 2007, Respondent filed an Answer (docket no. 59).  Petitioner filed two Traverses (docket nos. 61, 62).  The Court will proceed to consider the merits of Petitioner's due process claim relating to the BPT's 2002 parole denial.

---

[2]  While Petitioner's SAP is difficult to decipher, the Court has liberally construed it as claiming a due process violation based on his allegation that the BPT's 2002 parole denial was not supported by some evidence.

United States District Court
For the Northern District of California

1

**STANDARD OF REVIEW**

2

**I.     AEDPA**

3

Under the Antiterrorism and Effective Death Penalty Act (hereinafter "AEDPA"), a district

4

court may grant a petition challenging a state conviction or sentence on the basis of a claim that was

5

"adjudicated on the merits" in state court only if the state court's adjudication of the claim:

6

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

7

established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

8

a decision that was based on an unreasonable determination of the facts in light of the evidence

9

presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a

10

petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the

11

petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim

12

advanced, rather than denying the claim on the basis of a procedural or other rule precluding state

13

court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied,

14

546 U.S. 963 (2005).  It is error for a federal court to review de novo a claim that was adjudicated on

15

the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

16

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of

17

parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

18

**A.     Section 2254(d)(1)**

19

Challenges to purely legal questions resolved by the state court are reviewed under

20

§ 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim

21

adjudicated on the merits in state court only if the state court adjudication resulted in a decision that

22

was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as

23

determined by the Supreme Court of the United States."  Williams (Terry) v. Taylor, 529 U.S. 362,

24

402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have

25

independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a

26

petitioner's allegations against both standards.  See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50

27

(9th Cir. 2000), overruled on other grounds; Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

28

4

**United States District Court**
For the Northern District of California

### 1.    <u>Clearly Established Federal Law</u>

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Id.</u>  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." <u>Mitchell v. Esparza</u>, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  <u>See, e.g.</u>, <u>Stevenson v. Lewis</u>, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court.  <u>Williams</u>, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." <u>Andrade</u>, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.    <u>"Contrary to"</u>

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that

1  correctly identifies the controlling Supreme Court framework and applies it to the facts of a

2  prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."  Williams, 529

3  U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of

4  § 2254(d).  See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

5         **3.**     **"Unreasonable Application"**

6       "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

7  state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

8  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

9       "[A] federal habeas court may not issue the writ simply because that court concludes in its

10  independent judgment that the relevant state-court decision applied clearly established federal law

11  erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; accord

12  Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application

13  of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v.

14  Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to

15  "incorrect" application of law).

16

17       Evaluating whether a rule application was unreasonable requires considering the relevant

18  rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is

19  more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664

20  (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record

21  that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

22       The "objectively unreasonable" standard is not a clear error standard.  Andrade, 538 U.S. at 75-

23  76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the

24  overruling of Van Tran on this point).  After Andrade, "[t]he writ may not issue simply because, in our

25  determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the

26  'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

27  deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  Id.  In examining

28  whether the state court decision was unreasonable, the inquiry may require analysis of the state court's

method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.      Section 2254(d)(2)**

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**C.      Review of Parole Suitability Decisions**

The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions.  See Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); see also McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

**D.      Review Without a Reasoned State Court Decision**

The Court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state court was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that the Court must perform an independent review of the record to ascertain whether the state court decision was an unreasonable application of clearly established federal law.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).  The Court need not otherwise defer to the state court decision: "A state court's decision on the merits concerning a question of law is, and

should be, afforded respect.  If there is no such decision on the merits, however, there is nothing to which to defer."  <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir. 2002).  Nonetheless, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."  <u>Fisher v. Roe</u>, 263 F.3d 906, 914 (9th Cir. 2001).  In other words, the Court assumes the state court applied the applicable federal law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.  <u>See</u> <u>Himes</u>, 336 F.3d at 853.

## II.    <u>Exhaustion</u>

Prisoners in state custody who wish to challenge collaterally in federal habeas corpus proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the due process claim raised in his federal petition.

## FACTUAL BACKGROUND

Although Petitioner is not challenging the validity of his underlying criminal conviction, the facts regarding the commitment offense were relied upon by the BPT to deny Petitioner parole in 2002.  The facts regarding the circumstances surrounding the offense were read into the record at the hearing and are in accord with those summarized in the probation report prepared for the sentencing court after Petitioner's conviction.  The Court includes the following information, derived from the Alameda County Probation Officer's Report and Recommendation, about the murder:

> At approximately 12:45 p.m., Rosie Harris (wife of defendant), Veatrice Buckley (12-year-old daughter of Rosie), and victim Cecil Marzett (21) were at Rosie's apartment. Defendant came home and wanted to speak to Rosie in the bedroom.  Veatrice had seen the handle of a knife protruding from defendant's pocket and was afraid.  Cecil (Rosie's nephew) was telling Marvin [defendant] not to disrespect his auntie.  Finally, all three -- Marvin, Rosie, and Cecil went to Marvin and Rosie's bedroom.  Cecil and Marvin had words to the effect:

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

| | |
|---|---|
| Marvin: | "She's my wife," |
| Cecil: | "She was my auntie first;" |
| Rosie: | "That's right;" |
| Marvin: | "Get out of my house." |

Rosie tells Cecil to leave.  Cecil turns to leave and as he does, Marvin stabs him in the right front chest area with a long butcher-type knife.  Veatrice sees this because she stood watching in the hallway.  Rosie did not see the first blow because she had turned to take a puff off of her cigarette.  When Rosie turned back around, Marvin was straddling Cecil stabbing him.

(Resp't Ex. 2, Alameda County Probation Officer's Report and Recommendation at 3-4 [brackets added].)

## DISCUSSION

**I.    Existence of a Protected Liberty Interest**

Before reaching the merits of Petitioner's due process claim, the Court notes that Respondent has again raised the argument that Petitioner has no protected liberty interest in parole which would entitle him to the protections of due process at parole suitability hearings.  (Answer at 5.)  As mentioned above, Respondent first raised this argument in their motion to dismiss filed on September 26, 2005 after the California Supreme Court discussed various aspects of California's parole scheme in In re Dannenberg, 34 Cal. 4th 1061, cert. denied, 546 U.S. 844 (2005).  In denying the motion to dismiss on September 6, 2006, the Court found that the Ninth Circuit has rejected Respondent's argument and has made clear that California inmates continue to have a liberty interest in parole after Dannenberg.  (Sept. 6, 2006 Order at 5-6 [citing Sass, 461 F.3d at 1125]).  Thus, in accord with Sass, Petitioner was entitled to the protections of due process at his BPT hearings.

**II.    Due Process Claim**

**A.    Applicable Legal Standard**

"In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look at two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards."  Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been

9

**United States District Court**
For the Northern District of California

1  afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the

2  decision and (2) "some evidence" supports the decision to grant or deny parole.  See Sass, 461 F.3d

3  at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v.

4  Hill, 472 U.S. 445, 454-55 (1985)).

5       "To determine whether the some evidence standard is met 'does not require examination of

6  the entire record, independent assessment of the credibility of witnesses, or weighing of the

7  evidence.  Instead, the relevant question is whether there is any evidence in the record that could

8  support the conclusion reached'" by the parole board.  Id. at 1128 (quoting Hill, 472 U.S. at 455-56).

9  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence

10 that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting

11 Hill, 472 U.S. at 457).  The some evidence standard of Hill is clearly established law in the parole

12 context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

13      Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence"

14 standard on this point:  Biggs, Sass, and Irons v. Carey, No. 05-15275, slip op. 8335, 8344 (9th Cir.

15 July 13, 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor

16 of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing

17 and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging

18 factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the

19 rehabilitative goals espoused by the prison system and could result in a due process violation."

20 Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on

21 the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver

22 time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation,

23 denying him a parole date simply because of the nature of Biggs's offense and prior conduct would

24 raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which

25 criticized the Biggs statements as improper and beyond the scope of the dispute before the court:

26 "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."

27 Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on

28

**United States District Court**
For the Northern District of California

unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole.  Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  Irons, No. 05-15275, slip op. 8449.  Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs:  it is not the holding of the case.  The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons).  Sass did not dispute the principle that, other things being equal, a murder committed fifty years ago is less probative of a prisoner's current dangerousness than one committed ten years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons.  Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for

11

an arbitrary decision.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decisionmaker in the parole context.  In addition to the very low evidentiary standard that <u>Hill</u> imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  <u>See</u> <u>Greenholtz v. Inmates of Nebraska Penal & Corr. Complex</u>, 442 U.S. 1, 13 (1979).  "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.  Our system of federalism encourages this state experimentation."  <u>Id.</u>

### B.    Parole for Murderers in California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  A first degree murder conviction yields a minimum term of twenty-five years to life and a second degree murder conviction yields a base term of fifteen years to life imprisonment.  <u>See</u> <u>Dannenberg</u>, 34 Cal. 4th at 1078; CAL. PENAL CODE § 190.  The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is so great that parole is a rarity rather than the norm for murderers.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date . . . .  The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates."  CAL. PENAL CODE § 3041(a).  Significantly, that statute also provides:  The panel shall set a release date,

unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this

**United States District Court**
For the Northern District of California

1   individual, and that a parole date, therefore, cannot be fixed at this meeting.

2   Id. § 3041(b).

3       One of the implementing regulations, Title 15 of the California Code of Regulations § 2401

4   provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section

5   2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).

6   A parole date set under this article shall be set in a manner that provides uniform terms for offenses

7   of similar gravity and magnitude with respect to the threat to the public."  The regulation also

8   provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on

9   parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and

10  denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to

11  society if released from prison."  CAL. CODE REGS. tit. 15, § 2402(a).

12      In making its determination, the parole board may consider "[a]ll relevant, reliable

13  information available," including,

14
15      the circumstances of the prisoner's social history; past and present mental state; past
        criminal history, including involvement in other criminal misconduct which is reliably
16      documented; the base and other commitment offenses, including behavior before, during
        and after the crime; past and present attitude toward the crime; any conditions of
17      treatment or control, including the use of special conditions under which the prisoner
        may safely be released to the community; and any other information which bears on the
18      prisoner's suitability for release.  Circumstances which taken alone may not firmly
        establish unsuitability for parole may contribute to a pattern which results in finding of
19      unsuitability.

20  Id. § 2402(b).

21      Circumstances tending to show unsuitability for parole include the nature of the commitment

22  offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous,

23  atrocious or cruel manner."  Id. § 2281(c).  This includes consideration of the number of victims,

24  whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim

25  was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out

26  in a manner which demonstrates an exceptionally callous disregard for human suffering," and

27  whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

28      Other circumstances tending to show unsuitability for parole are a previous record of

13

United States District Court

For the Northern District of California

1  violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental

2  health problems related to the offense, and serious misconduct in prison or jail.  See id.

3      Circumstances tending to support a finding of suitability for parole include no juvenile

4  record, a stable social history, signs of remorse, that the crime was committed as a result of

5  significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism

6  due to the prisoner's present age, that the prisoner has made realistic plans for release or has

7  developed marketable skills that can be put to use upon release, and that the prisoner's institutional

8  activities indicate an enhanced ability to function within the law upon release.  See id. § 2281(d).

9      The regulations also contain a matrix of suggested base terms that prisoners with

10  indeterminate sentence should serve before they are released on parole.  The matrix provides three

11  choices of suggested "base terms" for several categories of crimes.  See CAL. CODE REGS. tit. 15,

12  § 2403.  If, as in Petitioner's case, the base offense is second-degree murder with the use of a

13  dangerous weapon (knife), the matrix of base terms ranges from a low of seventeen, eighteen, or

14  nineteen years, to a high of nineteen, twenty, or twenty-one years, depending on some of the facts of

15  the crime.[3]  See id. § 2403(c).  Although the matrix is to be used to establish a base term, this occurs

16  only once the prisoner has been found suitable for parole.  See id. § 2403(a).

17      The statutory scheme places individual suitability for parole above a prisoner's expectancy in

18  early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-

19  71.

20

21      While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum)
   sentences should "normally" receive "uniform" parole dates for similar crimes,
22   subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a
   release date cannot presently be set because the particular offender's crime and/or
23   criminal history raise "*public safety*" concerns requiring further indefinite incarceration.
   (Italics added.)  Nothing in the statute states or suggests that the Board must evaluate the
24   case under standards of term uniformity before exercising its authority to deny a parole

25

26      [3]  One axis of the matrix concerns the relationship between murderer and victim and
   the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for
27  the relationship of murderer and victim are "participating victim," "prior relationship," "no prior
   relationship," and "threat to public order or murder for hire."  The choices on the axis for the
28  circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or
   "torture."  Each of the choices are further defined in the matrix.  See CAL. CODE REGS. tit. 15,
   § 2403(c).

14

date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets and parenthesis in original).  Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found suitable for parole."  CAL. CODE REGS. tit. 15, § 2403(a) (emphasis added).  "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Dannenberg, 34 Cal. 4th at 1071 (emphasis added).  The California Supreme Court's determination of state law is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629 (1988); Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).

The California Supreme Court has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").  Granted the Ninth Circuit has stated that in some cases, "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."  Irons, 479 F.3d at 665; see also Biggs, 334 F.3d at 917 n.5.

### C.   **Analysis**

On state habeas review, the California Supreme Court issued a summary denial of Petitioner's state habeas petition.  (Resp't Ex. 11.)  Because there is no reasoned opinion addressing the merits of Petitioner's due process claim, the Court must perform an independent review of the record to ascertain whether the state court decision was based on an objectively unreasonable

15

**United States District Court**
For the Northern District of California

1    application of clearly established federal law.[4]  See Himes, 336 F.3d at 853.

2               **1.    Opportunity to Be Heard and Reasons for Denial**

3          Having stated that California inmates still maintain a liberty interest, the Court analyzes the

4    next prong of the Biggs test.  Under the second prong of the Biggs test, the first question pertains to

5    whether Petitioner was given an opportunity to be heard and whether he was given reasons for the

6    parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

7          Petitioner fully participated in his parole hearing as evidenced by the transcript of the

8    hearing.  (Resp't Ex. 3.)  Throughout the hearing, Petitioner was given the opportunity to make

9    comments or objections in response to the BPT's statements, clarify any misunderstandings[5] and give

10   statements regarding his parole eligibility.  (Id.)  In addition, the BPT laid out detailed reasons for

11   denying Petitioner parole, which are discussed further below.  The Court finds that the BPT satisfied

12   the requirements for due process under this prong.

13              **2.    "Some Evidence" Standard**

14         The next question is whether there was some evidence to support the BPT's decision to deny

15   parole.  What little guidance has come from the Supreme Court suggests that the "some evidence"

16   standard is extremely deferential to the original decision-maker.  See Hill, 472 U.S. at 454

17   (examination of the entire record is not required nor is an independent assessment of the credibility

18   of witnesses or weighing of the evidence; the relevant question is whether there is any evidence in

19   the record that could support the conclusion reached by the decision-maker).  Moreover, the

20   Supreme Court's comments suggest that the judiciary should be quite mindful of the subjective and

21   predictive nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13 ("No ideal, error-free

22   way to make parole-release decisions has been developed; the whole question has been and will

23

24   _____

25        [4]  The Court notes that the Alameda County Superior Court did not issue a reasoned decision
     addressing Petitioner's claim because his state habeas petition "fail[ed] to state a prima facie case for
26   relief sought."  (Resp't Ex. 8.)

27        [5]  At the 2002 hearing, Petitioner clarified the BPT's summary of the circumstances
28   surrounding the offense by stating the knife used to stab the victim was in between the bed mattress
     and not in his pocket.  (Resp't Ex. 3 at 15:13-19.)

                                                   16

continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.").

### a.   The 2002 Parole Hearing

Petitioner argues that the factors used by the BPT at the 2002 hearing were not supported by "some evidence," thus the denial of parole is in violation of his due process rights.  (SAP at 4.)

At the 2002 hearing, the BPT identified several factors supporting its decision to find Petitioner unsuitable for parole:  (a) the circumstances of the murder; (b) his criminal history and prior unstable social history; (c) his inadequate performance in prison; (d) his marginal vocational upgrade; and (e) his need for additional self-help and/or therapy programs.  (Resp't Ex. 3 at 49:8-51:17.)  The BPT also found that Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Id. at 49:12-14.)

### 1)   The Commitment Offense

At the 2002 hearing, the BPT considered the circumstances of the murder and concluded that it showed that Petitioner was unsuitable for parole and would pose an unreasonable risk of danger if released.  (Resp't Ex. 3 at 49:11-13.)  The panel stated that this was so because the offense was "carried out in a cruel, callous manner" which "demonstrates an exceptionally callous disregard for human suffering."  (Id. at 49:14-18.)  The panel then listed the fact-specific reasons it was finding Petitioner unsuitable for parole:

> These conclusions were drawn from the Statement of Facts wherein the prisoner was at his home where he had an argument with his wife and with the victim, his wife's nephew, Cecil Marzett, who was 21 years old at the time.  The two or the three went into the bedroom and were arguing and it escalated.  Mr. Harris took a knife that was in the bedroom, apparently, and stabbed Mr. Marzett.  Mr. Marzett died from the attack.

(Id. at 49:18-26.)

In deciding that this was a two-year denial, the BPT reiterated the violent nature of the crime and the manner in which it was carried out:

> [T]he hearing Panel finds that there's no reason to expect that parole would be granted at a hearing during the following two years, this is a two-year denial.  And the reasons are

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

as follows:  firstly, the commitment offense, carried out in a cruel manner.  Specifically he got into an argument with his wife and her nephew and ended up stabbing the nephew with a knife that was in the inmate's bedroom.  The victim died from the attack.  It was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(Id. at 54:3-15 [brackets added].)

### 2)   Prior Criminal History

The BPT considered all the relevant information in determining Petitioner's suitability for parole.  The information considered included Petitioner's past criminal history, including involvement in other criminal misconduct pursuant to Title 15 of the California Code Regulations § 2402(b).  The BPT found that Petitioner posed an unreasonable risk of danger to society if released based on his prior criminal history.

[H]e had failed to profit from society's previous attempts to correct his criminality.  Those attempts include juvenile probation, an [sic] adult probation.  As a juvenile he had an auto theft.  As an adult he had around 10 arrests; however, there were only two convictions that we found, a grand theft property and a fighting, noise and offensive words.  There were three DUI's that he says were not his and there are no dispositions shown, they were his brothers.  And like I said there were several other arrests which did not result in any type of conviction.

(Id. at 50:1-12 [brackets added].)

### 3)   Unstable Social History

The BPT relied on Petitioner's unfavorable social history in support of its decision to find him unsuitable for parole.  According to the BPT, Petitioner dropped "out of school at an early age and he was a heavy user of alcohol.  He told us today that he was drinking everyday to the point where he would pass out."  (Id. at 50:13-15.)

### 4)   Unfavorable Activities in Prison

The BPT determined that Petitioner's activities in prison were unfavorable, and this served as another reason to find him unsuitable for parole.  Specifically, the BPT found that Petitioner had committed four serious disciplinary violations (CDC 115's) and received nine counseling memorandum (CDC 128's) since his last physical appearance before the BPT:

He's had misconduct while incarcerated has included 11 128's, nine of those are since his last physical appearance before the Board.  The most recent were failure to attend, two of

18

United States District Court

For the Northern District of California

those in 2002, or failure to report, 2000, failure to report, '97; failure to follow orders, '97; failure to report, '95; disrespect towards staff, '94; disruptive behavior, '93; and not obeying the rules and regulations in '92.  He's had five 115's, four of those since his last physical appearance.  He's not been physically before the Board for 10 years, so they go back a ways.  The most recent was May of '97, for threatening staff.  Prior to that, July of '96, possession of inmate manufactured alcohol.  Prior to that, February of '94, possession of marijuana, and then January 12, 1993, knowingly providing false or slanderous information in an appeal.

(Id. at 50:23-51:14 [brackets added].)

### 5)     Need for Further Self-Help or Therapy Programming

The BPT found that Petitioner had not "sufficiently participated in beneficial self-help and/or therapy programming."  (Id. at 50:21-23.)

Despite examining the factors of suitability that would support parole, i.e., that Petitioner had plans for where to live and work if released and that he was upgrading educationally, the BPT found that Petitioner still "need[ed] continued self-help and/or therapy programming in order to face, discuss, understand, and cope with stress in a non-destructive manner."  (Id. at 53:8-12..)  The BPT determined that "[u]ntil progress is made, he continues to be unpredictable and a threat to others." (Id. at 53:12-14.)  The BPT noted:

His gains are relatively recent, so he must demonstrate an ability to maintain gains over an extended period of time, I refer to the 1997 115.  Nevertheless, the prisoner should be commended for his upgrading educationally.  He's working towards his GED, and is making very slow progress, but is making progress towards that.  He's taking courses in Bible study, AA and NA, Life Plan for Recovery.  He's been in substance abuse training, there's a 15-hour course.  He's currently in the Eagle program, and another, other programs through this Graystone Chapel.  He's got a couple of certificates from them and should be commended on those positive aspects of his behavior, but they do not yet outweigh the factors of unsuitability.

(Id. at 53:14-54:3.)

### 6)     Conclusion

As noted supra, the panel identified the fact-specific reasons to support its conclusion that Petitioner was unsuitable for parole.  Contrary to Petitioner's arguments in his SAP and traverse, the record shows that the BPT's findings were supported by some evidence.  The records show that the BPT conducted a thorough review and consideration of Petitioner's individual factors tending to show unsuitability and suitability for parole.  Indeed, the BPT recognized Petitioner's participation in

19

**United States District Court**

For the Northern District of California

1  AA and NA, educational programs and parole plans.  Nevertheless, the BPT found that Petitioner

2  was not yet suitable for parole because "he's not yet sufficiently participated in beneficial self-help

3  and/or therapy programming," "would pose an unreasonable risk of danger to society or threat to

4  public safety," has a history of prior criminality and unstable social history, and has performed

5  inadequately in prison.

6      Having reviewed the facts of the crime as recited by the BPT and the other reasons stated for

7  finding Petitioner ineligible for parole, the Court finds that there was some evidence in the record to

8  support the BPT's decision.  See Hill, 472 U.S. at 455-56.  Accordingly, Petitioner's claim of habeas

9  relief fails because the Court finds that the state court's denial of Petitioner's due process claim was

10  objectively reasonable.  See Himes, 336 F.3d at 853.

11      **3.      Matrix Argument**

12      Petitioner further claims that the BPT violated his right to due process because he is overdue

13  for release under the BPT's sentencing matrix.  (SAP at 3.)

14      As explained previously, the matrix is not consulted and a term is not set under state law

15  unless and until the prisoner is found suitable for parole.  See Dannenberg, 34 Cal. 4th at 1070-71;

16  CAL. CODE REGS. tit. 15, § 2403(a).  Petitioner was not found suitable for parole; therefore, the

17  matrix did not need to be consulted.  Moreover, the BPT determined that Petitioner was unsuitable

18  for parole after considering the factors outlined above.  Thus, Petitioner's claim that there was "no

19  real evidence" to deny him parole is unavailing.  Even if Petitioner had a due process right in having

20  state law followed by the parole authority, state law was followed by the BPT.  Accordingly,

21  Petitioner's claim is without merit.

22

23      **CONCLUSION**

24      For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of

25  the Court shall enter judgment, terminate as moot all pending motions, including Petitioner's motion

26  for leave to consolidate and motion for leave to file supplemental pleadings (docket nos. 60, 63), and

27  close the file.

28      This Order terminates Docket nos. 60 and 63.

1          IT IS SO ORDERED.

2     DATED:  September 28, 2007

3                                                    _____
                                                     SAUNDRA BROWN ARMSTRONG
                                                     United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

HARRIS,

        Plaintiff,

  v.

POWERS et al,

        Defendant.

_____/

Case Number: CV04-01478 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on October 4, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Marvin Cavil Harris C-91589
Avenal State Prison
#530-8-54-Low Bunk
P.O. Box 9
Avenal,  CA 93204

Dated: October 4, 2007

                      Richard W. Wieking, Clerk
                      By: LISA R CLARK, Deputy Clerk

P:\PRO-SE\SBA\HC.04\Harris1478.denyHC.frm        22